Please return to the recess center in your meadows. Hikvision USA, Inc. petitioner v. Federal Communications Commission of the United States of America. Mr. Wright for the petitioner, Hikvision USA, Inc. Mr. Blount for the petitioner, Southwest Knowledge USA, Inc. Mr. Dunn for the respondent. Mr. Johnson for the interpreter. Good morning. May it please the Court, Christopher Wright representing petitioners which manufacture video surveillance equipment. As I will explain, Congress carefully limited the covered list to equipment that is both essential to the prevailing broadband service and has certain dangerous capabilities and video surveillance equipment does not belong on the list. Mr. Blount will address the critical infrastructure. If I can ask you about this. According to Congress, video surveillance equipment manufactured by Hikvision and DOCWA is covered equipment that's a potential threat to national security. That's what Congress said. And then the FCC placed that equipment on the covered list because it's a potential threat to national security and subjected it to certain restrictions. Federal subsidies can't be used to purchase it. The FCC then decided to expand the restrictions on the covered equipment. That is a potential threat to national security. And the Commission said that it would not provide authorizations for that equipment. Congress then weighed in and said the FCC may not allow equipment authorizations for equipment. That, again, is a threat to national security. That is, quote, on the list of covered communications or services published by the Commission, unquote. You want us to interpret all of that to mean that Congress intended to ban equipment authorizations for only a sliver of the equipment that Congress thinks is a potential threat to national security. Only the sliver that's essential to broadband capability. And though Congress said that the equipment ban should apply to equipment, quote, on the list published by the Commission, unquote, you want us to hold the opposite, that it actually meant to allow equipment authorizations for most of the equipment that is on the list published by the Commission. So if I may, let me note that it's far more than a sliver that would be covered under our view. But let's look at the statute. So I'm looking at the statutory addendum that petitioners filed. I'm looking at page 55 of that statutory addendum. It might be that some of us have our own versions of the statute. Could you just tell us which statute? So I'm looking at section 2C, which contains... Which statute? Pardon? Which statute? The SEA? Which statute are you looking at? The Secure and Trusted Communications Act. I'm sorry, there's so many statutes involved in that. Yeah, no, that's fine. What page of the addendum is that on? 55. And it's subsection C, which contains the cross-reference that Judge Pan was talking about. And this makes clear that there's very limited purpose for this cross-reference. Sorry, you're going to have to back up again. Are you talking about the Secure Equipment Act of 2021? No, the Secure Networks Act. You're talking about 1601, subsection C, Reliance on Certain Determinations? That's right, Your Honor. So the parties have largely referred to 1601 as section 2, and that's how it's listed in the statutory addendum. So, but in any event, it says in taking action under subsection B1, the commission shall place on the list four different things. And the third one is the cross-reference to 889F3 that I believe does not have the consequences you're suggesting. But so the first line, again, is taking action under subsection B1. On the prior page, section B1 is listed, and it follows the threshold requirement that only covered communications, I understand that you're drawing a distinction between communications and telecommunications equipment. But since you're talking about subsection C, subsection C has four different purposes or means by which we can make a determination. And it seems that it's referencing Federal Acquisition Security Council findings, as well as Department of Commerce findings pursuant to an executive order. And those provisions talk in very broad terms about the types of issues they're addressing. For the Department of Commerce executive order number 13873, it talks about vulnerabilities in information and communications technology and services, malicious cyber-enabled actions, and economic and industrial espionage against the United States and its people. And it encompasses any hardware, software, or other product or service primarily intended to fulfill or enable the function or information of data processing, storage, retrieval, or communication by electronic means. The Federal Acquisition Security Council targets security threats to covered articles in the supply chain, and its mandate includes information technology, including cloud computing, services of all types, telecommunications equipment and services, related hardware, software, systems, and devices. And Congress cross-referenced these security threats and instructed the FCC to place these entities on the list based solely on these determinations. These determinations are broad. You're saying that Congress intended only to address the sliver that deals with broadband. Yes, Your Honor. So let's go back to the statute again. I'm just quoting to you from the statute and the references it's cross-referencing. How do you explain the references to the Federal Acquisition Security Council and the Department of Commerce, and how is that consistent with your definition that communications equipment can only relate to broadband services? Because that's what the Secure Network Act says, and it has three requirements. And the first is the federal requirement of communications equipment. The second is the B-1 determination by one of those four entities listed in Subsection C. And a third requirement, the equipment has to be capable of certain dangerous capabilities that the FCC is supposed to do. But doesn't that list seem to contradict your view of what communications equipment is? You're interpreting it as a very narrow thing, and what they're cross-referencing are very broad things. So let's remember that what Congress was doing when it adopted the Secure Network Act was deciding what it would pay for under the Rip and Replace Program. That's the bulk of that Act, Section 4. And Congress wasn't saying that it was paying to rip and replace everything. It certainly wasn't saying that it was going to pay for rip and replacing all the things that are in C, because it has two separate requirements. But the reason these entities were subject to the rip and replace requirement is because there was a finding by Congress that they're a threat to national security. Correct? That satisfies B-1. The focus on B-1 is on the entities providing the surface of the equipment. The focus in B-2 is the capabilities of the equipment. And, of course— Do you dispute that Congress has made findings that this equipment is a threat to national security, or potentially so? What about the 2019 NDAA, Section 89F3? So Congress decided in the NDAA that it wouldn't allow federal agencies to buy equipment. I understand all that. I'm just saying the reason these companies were subject to it was because there was a finding that they're a threat to national security. Correct? A threat. A threat. Correct. Even in the NDAA, Congress did not prohibit federal agencies from buying— No, I understand the effects of it. I'm just dealing with the categorization of a threat to national security. And I guess my question is, why do you read the FDA, the most recent act, to only address a sliver of what they think is a threat to national security? Because in the Secure Networks Act, Congress said it was only covering equipment that was essential to the provision of broadband and had the dangerous capabilities listed in Section 2B, as well as meeting the requirement of 2B-1. You know, there's also a definition in Section 16085—this is 47 U.S.C. Section 16085— that covered communications equipment or service means any communications equipment or service that's on the list published by the Commission. Your client's equipment is on the list. It shouldn't be on the list, Your Honor. That's a different question. It is on the list. And 16085 says if it's on the list, it's covered equipment or service. Your Honor, but that follows 4, which says that it has to be equipment essential to the provision of broadband service. There are a lot of different definitions here. But it just seems to me, if we take a step back and see what Congress was trying to say, is that they were saying, as clearly as Congress ever does, that they think that your client should not get equipment authorization. I think Congress said as clearly as—remember, this is a statute that doesn't have to do with equipment authorization. I'm talking about the Secured Equipment Act, which does deal with equipment authorizations. Well, we were looking at 9-5. But in any event, I think Congress— If we can just look at the Secured Equipment Act together just for a moment. It says there will be rules subject to the specific notice of proposed rulemaking, which involves expanding the consequences for being on the covered list. And it says in the rules that will be adopted, the commission shall clarify that the commission will no longer review or approve any application for equipment authorization or equipment, so we'll have no equipment authorization. For equipment, quote, that is on the list of covered communications, appointment, or services published by the commission. Your client's equipment is on the list. So, Your Honor, that's the ratification argument. If I could make one more comment. It doesn't say properly on the list. It just says anything on the list. Well, Your Honor, the Secured Equipment Act, it changed the consequences of being on the act, and did so rather dramatically. But Congress didn't say anything that's on the act improperly. And Congress also, in the Secured Network Act, said that things will come on and off the list. They can come on and off the list, but it's saying, at the time that they enacted this rule, that equipment that is on the list, published by the commission, there will be no equipment authorization for that equipment. That's what this says. Well, Your Honor, our position is that if this court decides that the equipment at issue is improperly on the list, FCC should take it off. If you could just tell me textually what allows us to look behind what's on the list. It says just on the list published by the commission. It doesn't say properly on the list. It doesn't say correctly put on the list. How are we allowed to do that based on the statutory language? I think this court has the authority to review what the FCC ordered at issue. And the FCC ordered at issue decided that the- But the FCC order has to comply with the statute. And the statute says that the commission is supposed to have to decide three things, and I think this is a statute that's very- I'm looking at the FDA, the Security Equipment Act. The regulation that you're challenging was issued to implement the Security Equipment Act. And the Security Equipment Act says if it's on the list, no equipment authorizations. Well, Your Honor, that would also then mean that Congress is willing to pay to rip and replace this equipment because it's the same list. Okay. That's a consequence of it. But the words of the statute are the words of the statute. Well, the words of the SNA make very clear that- And the SNA says published by the commission under the Secure Networks Act. It doesn't just say published on the list. So I take it your argument is it has to be published under Section 2A of the Secure Networks Act. I assume your argument is that brings in the obligation that the list be in compliance with the Secure Networks Act. Is that right? The list that is compliant with the Secure Networks Act. That's your reading. And your reading is that your placement on the list is not- And again, the commission has the duty to review and revise that list, add to it, and subtract from it. And if this court says that video surveillance equipment didn't belong on the list, then it should take it home. I'm making a narrower point. It's that the Secure Equipment Act didn't just say equipment that's on the list. It says equipment that is on the list of covered communications equipment under the network, what I call the Secure Networks Act. And your argument is that's fine. But we're not on a list of covered communications equipment under the SNA as a matter of law. We're not there lawfully on that list. I take it that's your argument because we are not, in fact, to be covered communications equipment, you first got to be communications equipment. So if this court holds that video surveillance equipment should not have been on the list, the commission will take it off. And then video surveillance equipment contains certification. I told them in the last Congress it was different. Let me tell you something. There is the express reference to Section 889F3 of the 2019 NDAA. What in 889F3 would qualify, under your view, as communications equipment? You would say nothing in subsection D, I take it. So telecommunications equipment produced by Huawei and ZTE and services provided by those companies. I just want to talk about equipment, not the services language. So just focus on equipment and not the services language. So what equipment in 889F3 would qualify? So equipment that's essential to the provision of broadband. Right. What in 889F3 can you tell me? Are you saying that Huawei's telecommunications equipment would satisfy, does qualify as covered equipment? Yeah. And just to get a little more granular, it might be useful. I mean, so this equipment is the equipment that internet service providers need to use to provide broadband service. What is this equipment? And that's what Huawei and ZTE mostly provide, the routers, the gateways, fiber, all of the stuff in the network. Are routers essential broadband equipment? If they're in the network, there's a line between what internet service providers do, which is essential to the provision of broadband, and then there's what end users attach to the network. And that's not essential to the provision of broadband. You can provide broadband service without video surveillance equipment. No one disputes that. So it's not essential to the provision of broadband service. It doesn't make it through the threshold. But Huawei and ZTE equipment would. All of it? Excuse me? All of it? All of the telecommunications equipment by Huawei and ZTE? I don't know if they sell things other than routers and gateways and all this stuff that makes the network. But they're major providers of that. Is there anything that Big Vision or Dahua creates or produces themselves that would fall, qualified as qualified communication equipment? No, they're video surveillance equipment providers now. I would note that... I'm sorry. They only do video surveillance equipment. Right. Do they do any switches or routers or wireless bridges, or would those not count? Well, they don't right now, but of course they could. Have they in the past? Except if they did. Have they in the past? No. But if they did, they wouldn't be able to... It would be on the covered list, and they wouldn't be able to get it authorized. So it would have an effect if they sold that kind of equipment. What if it's like a supplemental router? A security system that has a supplemental router and needs to buttress the router service provider? As a class, they wouldn't be able to sell that. Would that count as essential to broadband services? Yes. Supplemental router? An Internet service provider is going to have lots and lots of routers and gateways and all sorts of fiber and things. Yeah, it's designed so that if one of them fails, probably something else will step in. But we agree that what Internet service providers buy from companies like Huawei and ZTE and the service they provide, that's what's covered. And that's what the findings... What if your clients, as part of installing their video surveillance and security system, install supplemental routers to strengthen whatever the signal is, so that it can now support all the needs and demands of the surveillance system? With respect to sort of the boundary issue, we did put in the record some of our comments that are designed to show the difference between where the boundary of the network and customer premises equipment lies. And remember, that's the traditional distinction. The FCC has, since 1934, regulated networks, telecommunications networks, but not CPE, not customer premises equipment, unless there's some specific reference. So this is a natural line to draw. And, again, Congress was interested in protecting networks and communications while they're on the network. And it wasn't interested in paying to rip and replace all of the equipment that customers and users attach to the network. This was a carefully limited statute with three requirements, and two of them aren't met, and all three requirements have to be met. How do we know – I think a difficult question in this case is what the Secure Equipment Act of 2021 was doing. It was certainly saying this will be the consequence for being on the list, right, barring authorization. But how do we know that it wasn't also, when it says – when it says barring authorization for equipment that, quote, is on the list, that it – and the list – the only equipment on the list – the only equipment on the list are the things listed in 889F3. That's the only stuff that's on the list at the time Congress – this isn't like – it's not like it's a 40-page list that Congress wouldn't have been aware of. It was, for equipment, it was the 889F3 equipment. And so it seems to – and I get your textual argument. It's just I'm struggling also with how do we assume Congress didn't know what the composition of the list was when it actually did. Congress also knew what it said in 889F3, although the FCC didn't, in terms of – in relation to 889A2. That's the provision that says nothing in this section covers equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets. That's very parallel to the requirement in 2B2 of the Secure Networks Act. But what it means is that Congress wasn't even prohibiting federal agencies from buying video surveillance equipment. And that's clear if you look at the addendum to our reply brief. So are you saying that – and Congress says in 889F3 that video surveillance and telecommunications equipment produced by your clients and other companies count as covered telecommunications equipment. In fact, they don't because they don't satisfy 889A2B? Yes, Your Honor, and two points on that. First, that's made very clear by the – again, the addendum in our reply brief, which is GSA's interpretation of 889. And the commission just missed or if it saw it, it failed to note that the A2 provision. But GSA makes quite clear in what gets called the decision tree that you first look to see if your federal agency, and you want to buy video, you know, some sort of equipment, is it mentioned in F3? And if it is, you then look at the A2, which I just read, and if the answer is no, it can't do these dangerous things, you can buy the equipment. And again, it was critical to the FCC's misunderstanding that it thought that Congress in the NDAA had said that anything that's listed in F3, federal agencies can't buy it. But the Secure Networks Act only references 889F3 equipment and does not reference 889A. So it has the – it says that equipment should be on the list only if it meets the threshold, and then if and only if it satisfies the requirements in B1 and B2, 2B1 and 2B2. And 2B1 has cross-reference, but 2B2 is very parallel to 8892B because, you know, if we turn back to the Secure Networks Act and look at Section 2B2, which is on 54 of the statutory addendum, you see that it first has to be communications equipment, and then it's on the list if and only if it meets B1 and meets B2. And B2 has this list of dangerous capabilities that, as I just said, are very parallel to those in 889. It – I think the text answers the question, but the court might also note that, again, Congress in adopting the NDAA was very focused on Huawei and ZTE made detailed findings, and that's what this – it was an amendment. It was an amendment that added S3, and as we discussed in a footnote, the amendment wasn't the result of any careful study. It was – You can't write opinions saying that we think Congress was just kidding about 889S3, especially when it passes a later statute that references it. So – The Secure Networks Act expressly references it. So it references it, but Congress didn't – Congress – you know, it still doesn't pass the A2. So I'm just saying it's not surprising that there might be something on that list that federal agencies could buy, and perhaps that's how – yeah, I don't know that I'd write that in the opinion, but you're kind of – the consequences – Were federal agencies buying that stuff? The consequence of the cross-reference still has meaning. Anything that's in S3, as the decision tree shows, before an agency buys it, it has to consider whether it has these dangerous capabilities. So are agencies still capable of buying this? Yes. In your view? And have they been buying it? Has any agency been buying it since the 1990 NDAA? I don't know the answer to that question. The record doesn't say. I'm just trying to figure out if agency government behavior reflects what you're saying. Right. If they read the statute the same – if the rest of the government reads the statute the same as you, I would think this would put them off. Yeah. I mean, you know, I will note that after – that the military's response was, these cameras don't present any national security threat. We don't even have them attached to the Internet, which, again, I mean, not only is this equipment not essential to the provision of broadband, you can use it without even attaching it to the Internet. Any other questions? All right. We'll give you some time on rebuttal. Thank you. Are companies planning to do rebuttal, or just one? Okay. May it please the Court, the FCC adopted an unreasonable interpretation of the term critical infrastructure. This interpretation flies in the face of the consistent use of this term by Congress in previous statutes and by other agencies throughout the government. It's so overbroad that it creates effectively a presumption that everything in the entire economy is critical, and it's implausible on its face. If they had just adopted the definition of the Patriot Act without the additional connected to language, would you have any challenge? We would not be here arguing this point today, if that were the case. The FCC didn't stop there, though, as you know. It went on and cited the 16 sectors, one of which is commercial facilities, which, of course, encompasses a huge portion of the economy, and 55 functions, and said that anything connected to one of these sectors or functions could reasonably be considered critical infrastructure. That's unreasonably broad. Critical means indispensable or vital, and the Patriot Act definition incorporates that concept. The Patriot Act definition has also been used in several other statutes, including another section of the 2019 NDAA, which is where Section 889 was adopted. The FCC got these 16 sectors from a presidential policy directive, but while the presidential policy directive defines the sectors, it never says that anything connected to one of these sectors is necessarily or even presumptively critical infrastructure. It designates a specific federal agency to oversee each sector and strengthen the security of critical infrastructure within that sector, something the FCC probably knows because they're one of the agencies that's designated in that directive. The FCC says that our examples of laundromats and used car lots are far-fetched. They don't say why. They certainly don't dispute that those are commercial facilities and, therefore, connected to one of the sectors designated in the policy directive, but they say that they couldn't reasonably be considered critical infrastructure. If they can't articulate why that is, then how is any party supposed to determine what critical infrastructure is or is not? The FCC and the intervener suggest, well, you can always go back and ask for clarification, and the clarification will be provided by the FCC staff, who, of course, are bound to apply the order that the commission has adopted. So I don't think that that's – I think that's an illusory remedy. If the court has no other questions, I'll reserve the rest of my time. Thank you. Thank you very much. Good morning, Your Honors. I'm Matthew Dunn for the FCC in the United States. I would say this APA challenge is a little unusual because the agency is doing so specifically what Congress told it to do. Here we had an NPRM in which the agency proposed a course of action. As you know, that's refusing to further authorize equipment on its covered list. And then Congress passed a statute saying, yes, referencing this NPRM by the docket number and saying, yes, you should do exactly what you proposed to do. So you read the statute as not only prescribing consequences for being on the list but as also ratifying the content of the list? We do read it that way. I think the first prong is sort of unassailable, but also I think there's strong evidence for the second, yes. What's your best evidence that that's the reading? Because it does say the list published under Section 2A of the Senior Networks Act, which has lots of requirements, but they say we're not satisfied in this case. It does. I think so textually you can read it as well as I can, but I think the context speaks volumes here. So there's a kind of iterative back and forth between Congress and the FCC. Congress was the one that first named these companies in the 2019 NDAA. And telecommunications equipment, but then it's the same Congress that chose Photo Secure Networks Act to use a different phrase specifically defined to require that you'd be essential to, for shorthand purposes, broadband services. So Congress chose a very narrow definition there which did not map onto the 2019 NDAA language. And so I'm trying to figure out what the iterative process is here. I would like to get to that, but just to finish answering your question about the meaning of the Secure Equipment Act, I think it would be a strange course of action for Congress to think that the FCC had gotten it wrong, that the covered list had things it shouldn't have on it, and then just sort of wouldn't say follow your course of action without speaking to what, as you point out, there are only a couple of entities on the covered list. So if the FCC had gotten that wrong, I think that the Secure Equipment Act would be a very strange statute indeed. So even if the text doesn't say, and specifically Dawa should be on there in high division, I think that that's by far the more reasonable interpretation of what the FCC was supposed to do. And what would happen going forward? So you read it as ratifying just the content of the list or both the content of the list and the FCC's interpretation of the definition of communication equipment to include not what the statute says, but used in or used with broadband services. Do you think that was ratified too, that definition? I think that's the better reading, but of course we don't, either of those possibilities offered by you would take care of the case. No, I'm not sure it would because so two years from now and another company, brand new, nowhere on the list, comes along and the FCC says, your product is used with broadband services. It's not essential to it, but it's used with it. And they challenge it and they go, what part of essential can't you understand? That's what Congress said, plain language, that's what they meant, all our usual rules of statutory interpretation, we read it, we've got to apply it, and then your client comes along and says, oh no, Congress in this act here, which made no reference to our definition of covered equipment, in fact referred us back to the statutory definition of covered equipment, Congress signed off on essential being scratched out of the U.S. code and what we pencil in is stuff used with. Is that what we would have to do? No. Then it didn't ratify your interpretation, it only ratified your list. Well, okay, so the Secure Equipment Act, so I have several responses, a little bit of a long question, the Secure Equipment Act does, it's true, it lists the Secure Networks Act, but what it says is, I'm reading now from the Secure Equipment Act section to a commission, which will clarify the commission will no longer approve or application for equipment or authorization for equipment that is on the covered list, so the list of covered communications equipment published by the commission under this section 2. Now, I think that the work of under section 2 is just clarifying what list we're talking about. As Judge Pan pointed out, it does, instead of saying equipment which is properly interpreted as or covered equipment or something of that nature, just that on the list, what list are we talking about? We're talking about the list published pursuant to the Secure Networks Act. I think that's a fair reading of the statute. You asked about what happens in the future if somebody else makes video surveillance equipment. Not video surveillance equipment, I'm not telling you what it is, but I'm telling you it's something that does not, it is not remotely essential to the provision of broadband services. It is simply something that you plug into your computer. Okay, so it wouldn't be on the covered list unless it met all of the prongs of the covered list. I think a reasonable reading of the Secure Networks Act... Which prongs still apply after your reading of the OCA? Does it still have to fall within the statutory definition of covered equipment? Yes, it must, but we find that it does. Wait, I really got to understand this. Absolutely. And when they say the statutory definition is, and I think you can't dispute this, the statutory definition textually is essential to broadband services, correct? It doesn't say essential to broadband services, it says essential to advanced communication. Which is then defined as provision of broadband services and blah, blah, blah. Well, but the blah, blah, blah is important. Okay, tell me how that is, that's really helpful. So I'm now going to look at... High-speed switch broadband telecommunications capability. High-speed switch broadband telecommunications... I wasn't leaving, I omitted the adjectives for time's sake, but I'll put them back in. So now they say we are not remotely essential to the provision of high-speed switch broadband telecommunications capability. Right, that is a capability that enables users to originate and receive a number of things, including video telecommunications. It's a capability that enables, creates this power. It's not the things that use that power, this is the stuff that creates that power. Using power and creating power, right? The electrical company creates the electricity in my house, right? That enables me to plug my microwave in. But that doesn't make my microwave a provider of electrical power, correct? That is correct. And my microwave is not essential to the provision of electrical power just because I plug it into the outlet, correct? That is correct. Okay. So they have equipment that they say we just sort of plug it in to whatever broadband service you have, whatever Internet service you have, and how is that essential to the provision? So one form of advanced communications is video telecommunications. On this definition? Sure, yes. So it's impossible to have video telecommunications without a video camera. It's possible to have lots of other kind of advanced telecommunications, but one form of that is a video camera. It is, at a minimum, reasonable to interpret the statute to include devices which make that. It's not entirely clear. I don't have it in front of me, but the way it's stated is the broadband, et cetera, that's capable of doing X, and they're capable of your melding into the general definition. Broadband. Right. I think it's true that it's subject to a number of different readings, but I guess what I would say is backing up is that Congress has something in mind in the eight – Are you saying that everything – Could you finish that answer? Yes, okay. So Congress had something in mind. It was targeting some kinds of technology in the Secure Networks Act, which in turn cross-references the 2019 NDAA. So I think Congress was worried about these devices. Under petitioner's reading, it was worried about it maybe in the 2019 NDAA, but the Secure Networks Act is supposed to have a narrower scope, and it meant to carve those out. But it's a subtle mechanism that they're proposing, and I think a more reasonable reading of the Secure Networks Act is that Congress was concerned about this. That's why it cross-referenced the previous statute. Just to follow up on that, one of the things that troubled me about reading these briefs is I don't see any reference to any technical studies that indicate that any of this equipment that's issued here has the capability of threatening the national security of the United States. And you said a number of times Congress was concerned that these were Trojan horses, but has anybody taken any of this equipment apart and seen whether there are any kind of bugs in there that could be used for nefarious purposes? Well, with the caveat that it wasn't necessary for the agency to reach that because it was relying on the determination of Congress. Just sort of as a matter of general interest or judicial notice, I point you to it. There's a couple of footnotes or a footnote with some newspaper articles which study the petitioner's equipment in particular, Dahua and Hikvision, that these were subject to hacking, remote hacking. And also there's a commenter in this proceeding named IPVM, which is a security expert who submitted a lot of comments, but this particular— Who was that, IBM, did you say? No, sorry, IPVM is the name of that commenter. We cite their comments in our brief if you want to follow that up. So there's some evidence of that, but I began by saying that that's not how these guys wound up on the covered list. Secure Networks Act referred to the previous statute and the FCC relied on that determination from Congress. If you had another entity going forward, maybe somebody that makes something which could be connected to the Internet, then this capability prong of the statute would probably do a lot of work and you'd have to say was it capable of posing this kind of threat. But in this case, the agency's position was that determination had been made by Congress. Got it, thank you. I just want to know what the statutory text is applying that next case. I want to make sure I understand your position. So that next case, they're going to say we are not essential to the provision of high-speed switch broadband telecommunications capability that enables things. And your reading is that the definition of what's essential to the provision of high-speed broadband. Can I just say broadband to save our time? Sorry, the adjectives are not what's important. My point was just that lumped in with that was video communication. That's what it enables. And so your reading is that what is essential to the provision of power that enables activities is also the activities that are enabled? Because video equipment doesn't show up until the end as a list of things that is enabled, that you can do with broadband. I'm just trying to understand. So you read the enablement clause as also part of the definition of what counts? I think that's a reasonable reading. Is that your reading? Is that the commission's reading? Because you keep saying it lists video telecommunications, but it only lists that as something that's enabled by the broadband telecommunications capability. So that is the commission's reading. So here's why I think the commission's view of the Secure Networks Act is in order to be communications equipment, we're going to have a broad definition. We're going to interpret essential too broadly, and the agency explains why. But that doesn't put you on the covered list. That's just sort of you're in the basket of things which are eligible to be on the list. No, I'm just still trying to understand. This is plain English. So you read everything that's enabled to be used by broadband telecommunications. That's everything. That's everything. I'm sorry. Can you say that one more time? You're reading everything that's essential to the provision of high-speed switch broadband telecommunications capability that enables users to originate and receive and lists the things that users originate and receive. You're saying what they originate and receive, which is anything anyone does on their broadband, on their internet, right? Anything that I use on the internet at home is enabled by that internet. Graphics, voice. So devices which would make use of that capability and become part of the network which allows that activity. So that makes those devices become essential to the provision of this capability. I'm just trying to make sure I understand this. Right. So the essential comes from the Secure Networks Act, and then this capability is defined. As I'm sure you know, this specific definition really served a different purpose originally in the 1996 communications act. So essential to what? Essential to advanced communications is what Congress actually said in the Secure Networks Act, and then it cross-referenced another statute. Okay. And the agency said, well, what do we think is going on here? Why is it cross-referencing this other statute? And one clue that we have about what this means is these forms of equipment that are referenced in the 2019 NDAA. So I think, you know, we often wish Congress had written things with more pellucid clarity, but here I think it was clear that Congress was trying to get at something, and it was very reasonable for the SEC to say whatever else is in this basket, but it looks like they're concerned with video telecommunications or, excuse me, video surveillance equipment from HikVision and Dialog. Can I ask a question? Is there a procedure by which HikVision and Dialog can contest their presence on the list, other than what they've done here? So I think the room adheres with Congress because the way they wound up on this list was a determination made by Congress. That's the only way. There's no way through the agency they can challenge that. I think so, because what the SEC has said is we don't have discretion to make further determinations about capability, et cetera, because Congress has made that determination. We do have a standing argument. I notice you've not asked questions about it, so I don't need to belabor it, but we think there's a... Did you want to talk about the definition of critical infrastructure? Yes. I was going to say I'm happy to talk about critical infrastructure. So, as this Court knows well, agencies can proceed incrementally. They can have a rulemaking and then follow up with further explication through adjudication, and that's pretty clearly what the FCC envisions happening here. It cross-referenced other expert government sources, the Patriot Act, and then two other executive agencies who deal with critical infrastructure all the time, and it said this is what we think is critical infrastructure, and if you have any questions, please bring them to us. So you said anything connected to... Right, it did. It did, but all of that, if you look at Paragraph 212... Are laundromats in or out? We don't know, but I think... No? No, we don't know yet. I mean, I think that's fair. Agencies can proceed that way. So what's happening now... Great. So do you have a meaningful definition that anyone can predict things under or not? Yes. So it still has to satisfy the definition in the Patriot Act. So that's what... No, you said, or anything connected to the definition, what's defined in the Patriot Act and the other definitions. Yeah, I think read fairly what the agency said is we are adopting the Patriot Act definition, which is, you know, resources so critical that impairment would be a threat to national security. And then the agency said anything connected to that critical infrastructure will also be critical infrastructure. Well, it said, could... Let's look at Paragraph 212, I believe. Or, sorry, yeah, so Paragraph 212. Which page is that of a JA? It's JA 210. Okay. Okay, so it begins by saying we are adopting the meaning provided by the Patriot Act. And then the agency goes on and references these other, these two sources. And says, for purposes of implementing the rules, we find that a system connected to these other sources could reasonably be considered critical infrastructure. But my, I think, a fair reading, this still has to fit within the Patriot Act definition. Wait, say that we're, sorry, you're in Paragraph 212? I jumped to the end of Paragraph 212, which is actually JA 210. The next page, right?  The end of that paragraph. So I think all the... We find that these systems or assets, physical or connected to, could reasonably be considered critical infrastructure. So does that mean they are or they aren't? Or does that mean it's a free-for-all, you've got to go through it one, everyone's got to adjudicate this one instance at a time before the agency? Well, so I'd say two things. It always has to fit in this basket of the Patriot Act, right? So it still has to be a system... No, you know this when you say it, but in addition, things connected to. Well, I think a reading, a fair reading of this paragraph... The 16 in the Presidential Directive and the 55 in the, I forget, National Critical Functions, could reasonably be considered critical infrastructure. Reasonably considered by whom? In Paragraph 212, we delegate to these bureaus to further develop further clarification. I'm just asking you, what is the point of the sentence if it does not sweep anything else? Does this sentence, could reasonably be considered critical infrastructure, does this sweep anything in that's not covered by the Patriot Act or these two documents? Yes or no? Oh, you mean does the specific word connected sweep something in? So all it's connected to is these other two documents. So I think it still does, the sources in those two documents. So when you say connected to, it's not, connected to is not a reference. It says connected to the 16 and the 55. So it's things that are connected to the list, the two... Right, I think if you have a concrete example, when the agency has a concrete example in front of it, it can speak to this more clearly, as it's going to happen right now. So if petitioners have these marketing plans, they have to explain how they're... Can you tell me, is there anything that counts as connected to these critical infrastructure lists? I'll just call them the lists, just so you understand, the two lists. That isn't on those lists already. I don't think so. Have you looked at the... I have looked at these lists, but I don't understand then why you don't just stop and say we're doing the Patriot Act definition as well as the things on these two lists. You're telling me connected to the two lists just means on the two lists. I have only what's in front of me, which is this paragraph, but I think that that's a fair reading of it. No, no, no, I don't want a fair reading. I want to know what the FCC is reading. All the FCC has said, of course, is what's in the paragraph, so I can't go beyond that. But I think that when this court is trying to decide whether the agency acted reasonably, and I think the question there is, was this a reasonable way to explicate the term critical infrastructure? And this court has said many times it's reasonable to proceed incrementally. It's reasonable to have a rulemaking and then elucidate through adjudication. I mean, the alternative might be to list every kind of business in America and have a checklist in or out, but that would be a very long list indeed. So this seems to be a reasonable way for the agency, which is a communications agency, not a national security agency, to proceed. Any other questions? Yes. I just have one final question. So one way we could resolve this case is just to read the Secured Equipment Act as saying there should be no equipment authorizations for people on the list identified by this. These petitioners are on the list, and the regulation implements that. And we would not have to read into the Secured Equipment Act any ratification of the process by which these petitioners got onto the list. We can just take the Secured Equipment Act at face value, can't we? You can. And then we wouldn't have to get into any of these other statutes and what they say and whether, like, who should really be on the list and who shouldn't and what does all this mean? I think that's a fair way to decide this case. The only thing I would say is if the agency got it wrong and misinterpreted the Secured Networks Act, this would be a strange course of behavior for Congress. So I think I submit to you the better reading. I have no idea what Congress was thinking about that process. And couldn't this just be resolved in a future case when somebody else gets put on the list and they want to litigate whether they should be there or not? That is when all of these statutory arguments would properly be considered. I think that's an excellent way to decide this case. Thank you. All right, we'll give you two minutes. Oh, I'm sorry. I'm sorry. Thank you, Your Honor. It may please the Court. Tom Johnson appearing for Motorola Solutions. You know, often, Your Honors, in these administrative law cases, courts, even without explicit evidence, will apply a canon saying that Congress is presumed to be aware of the administrative interpretation of a statute. Here we don't need to guess because Congress explicitly referenced the FCC's equipment authorization proceeding by docket number in the Secure Equipment Act, as well as the covered list, which applied only to those handful of entities that appeared on the NDAA. And in this sensitive national security area in which this Court frequently defers to the political judgments, the judgments of the political branches, it's an unusual case here where you actually have a Congress that is very responsive to what the FCC is doing and has shown time and time again that it is willing to enact new laws to cap in the FCC's discretion and ensure that the judgments of national security agencies are being taken into account and to tell the agency exactly how to do it. So this is not a process that is broken. And to address some of the questions that you raised, Judge Blatt, in terms of the outer meaning of what essential might be or what covered communications equipment or services might be under this statute, at minimum, it has to be broad enough to encompass the subsection C determinations that Congress said the Commission must place on the covered list. And so if you just read the text of C3, which is the one that's at issue here, the communications equipment or service being covered telecommunications equipment or services, as defined in Section 889F3 of the NDAA. And so we're looking for either what's the most reasonable reading of this statute, if you're going to defer to the FCC, or at minimum, what's the better reading of the statute. And it is by far better to presume that in such a prescriptive statute, where the Commission is being given explicit instructions that Congress didn't intend to bury within a single word essential, some additional limitation on what might appear on the covered list, to raise all the problems you're discussing, Judge Mullin. Are routers in or out? Are redundancies in the network in or out? In reply, they said, well, it's not an equipment specific. It's actually a problem of saying anything that's used with broadband counts as essential to the provision of broadband. I don't think that's a problem. Again, looking for the better reading. I mean, this Court has often said that the word necessary can't literally mean indispensable. It's just unworkable, and we've got the statute. I mean, we cite in our brief examples of cases where... The word here is essential, right? The word's essential, and so we're not aware... It doesn't contribute at all to the provision of broadband service. Well, we would disagree, Your Honor. First of all, we do think it's sort of a nesting doll where, at minimum, it encompasses the NDAA equipment based on the language of C-3. But even if not, Your Honor, we do cite to authorities in our case even the dictionaries that the petitioners cite that say essential doesn't need to mean literally indispensable. I mean, you talk about an essential question, an essential problem. Does that have to contribute in some way to the provision of broadband? Yes, Your Honor, and I think that surveillance... Okay, how does the video equipment contribute in some way to the provision of this high-speed switch broadband telecommunications capability? Sure, it is a capability that permits the end user to connect to a network. No, that's what's created. The thing is, it has to be essential to creating the capability. That's what the text is. You can't say the things that you can then do with it are essential to creating the capability. Well, Your Honor, before we get to the more technical definitions, right, the very start of the phrase is essential to the provision of. So if, as I would submit, essential is broad enough to mean something like core characteristic of the nature of, important to, peripheral end user equipment, it fits that definition. To the provision of what? Because... What do they provide? They provide a form of advanced communication services, which is video. They do? Okay, so video surveillance equipment is a form of... Because advanced communication service has a definition. I just, I'm trying to, I'm not in this technical area at all. So their video equipment is a form of high-speed switch broadband telecommunications. Your Honor, they're not providing broadband service. They're providing end user devices that connect to the network. And I agree, perhaps this could have been written more artfully, but it's clear that in the NDAA, video surveillance equipment is included. If you construe it the other way, then your argument is that means Congress made a mistake, not the FCC. It would be Congress that made the mistake. That's exactly right, Your Honor. And Judge Pan made a similar point earlier, which is you would be looking at this single word to essentially eliminate from the covered list HIC vision equipment, DAO equipment, because they say they are customer premises end user equipment, as well as ZTE. You asked a question about ZTE. ZTE is a cell phone manufacturer. There's evidence that the legislators were particularly concerned about ZTE. If cell phones produced by ZTE could not be on the covered list, that would be the implication if we read essential to only refer to core network equipment. And Judge Randolph, this sort of relates to a question you asked about what Congress was concerned about and how we would know. Counsel for the FCC mentioned the technical capabilities. But if you look at the NDAA, this section at the very end after it lists these specific companies, there's a catch-all that says video surveillance equipment or services produced or provided by an entity, this is F3D, that the Secretary of Defense reasonably believes to be an entity owned or controlled by or otherwise connected to the government of a covered foreign country, which is China. And if you go back to the first supply chain order, again, it's been an iterative process, the very first supply chain order. Would you give me the citation again? Absolutely, Your Honor. That is subsection F3D. I could try to find it in the appendix as well. Oh, yes. Yeah, it's the critical infrastructure. So that's what Congress cared about, Your Honor. And in the first supply chain order, there was both a public and confidential record talking about how Chinese state-controlled companies need to comply, the espionage law in China to provide backdoor capabilities into equipment. All of these orders have been building on one another. And so Congress has made this determination, and that is why, Your Honor, that the more plausible reading of the statute is to say that anything with the capability to interact with the network has this potential. And, again, that is sort of the judgment of Congress. I was going to respond to your question about future cases, Your Honor, if I have a minute. If there's any other further questions, I'll see you all later. Thank you very much. Thank you. Thank you, Your Honor. Thank you, Your Honors. Judge Randolph, you asked about whether anybody had considered what dangerous capabilities equipment at issue has. I'd just like to note that in paragraph 169 of the FCC's order, it specifically declined to even try to explain how this equipment had dangerous capabilities. And that contrasts very sharply. Was there any history with respect to your client and the other company of any interactions with U.S. security that may have put Congress on the alert for this? Your Honor, what happened was a representative, a member of the House, visited Fort Leonard Wood, was very concerned that they were using Hikvision cameras. Dawei makes very similar equipment. That's how the amendment got into the… I suppose that if you were worried about it, as Congress apparently was, that it would be impossible to open up and inspect every single surveillance camera that went into a home or a business in the United States. How else could you regulate it except by barring it altogether? Right. But remember that SAMACT has the dangerous capabilities requirement in it. So somebody has to determine whether it has dangerous capabilities. Exactly. And let me just say that this is in contrast to the Huawei and CTE equipment. The bill, as it entered into the House, had detailed findings about Huawei and CTE equipment. And, of course, it didn't mention video surveillance cameras. Not about your client. And DOJ and various other federal agencies have issued reports about Huawei and CTE, but nobody has said that video surveillance cameras have the dangerous capabilities in the act. Well, what do I do if I think it's a very close question? For the political branches, one reason of the statute is that the political branches have come together and said those on the covered list shall not have their equipment authorized. Full stop. Do we as a court need to defer to what is a… This is national security, not our wheelhouse. Right. Do we have to say, I think as Judge Pan has suggested, that they didn't really mean what they seem to… The obvious consequence of what they've said. Instead, there's this sort of hyper-technical definition that we're supposed to go back and employ, even though Congress itself doesn't seem to be using it. So, well, I think the task is to look at the text of the SNA, which has three requirements to be on the covered list. And I think your questions… I mean, essential doesn't mean used, and that's implausible. And, you know, you understand clearly that just something that could be plugged in isn't essential to broadband. This equipment flunks the threshold test. Congress would want to change that. It can't. But I think you have to read the statute, and Judge Pan, I think the easiest way to proceed is actually to address the threshold issue, determine that video surveillance equipment is simply not essential to provisional broadband service, and that's all you need to decide. Let me note one other thing with respect to the Secure Equipment Act, and part of the reason why I think it's clear that it only applies to the consequences of being on the list, not the requirements for being on the list. In the NPRM that was referenced by Congress in the SCA, the FCC determined in paragraph 65 of JA-47 that it was not specifically authorized by the Secure Networks Act to deny certification to equipment on the covered list. And so Congress then stepped in and said, oh, yes, you should deny certification to things on the covered list. That's the consequence. It said nothing about the requirements of being on the list. Thank you, Your Honors. Any questions? No. Okay. Do you want one minute? I would like to address one point that Mr. Dunn made during his presentation, which was that he said the FCC is proceeding incrementally by adjudication to determine what critical infrastructure means. I would say that even if the FCC had stopped with the Patriot Act definition and not added the additional commentary, there would still be borderline cases where adjudication would be necessary to determine what's critical infrastructure. The problem we have in this case is that the FCC has prescribed an unreasonable standard to be applied in those adjudications. And it has immediate effect because all DOTY and HIC vision equipment, at least by the terms of the list that the FCC prescribed, is now covered equipment and is subject to various restrictions under the Secure Network Act, such as you can't use federal funds to purchase it. So we believe that this is an issue that's ripe for adjudication now. Questions? No. Thank you very much. The case is submitted.
judges: Millett, Pan, Randolph